## Phipps *v.* Phipps, Appellant.

Argued October 10, 1949. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent).

*Thos. D. McBride,* with him *Milton J. Kolansky, David Berger* and *McBride, Lipschitz, Woolston, Berger & Bohlen,* for appellant.

*Will Leach,* with him *Leach & Lenahan,* for appellee.

OPINION BY DITHRICH, J., January 12, 1950:

Although respondent testified "I know I made a mistake when I married him," she and libellant appear to have lived a fairly normal married life until one Fred or "Freddie" Martin was engaged by libellant as a chauffeur-butler. From the time he entered the Phipps' household until they separated approximately two years later, libellant detected a gradually increasing indifference and coolness in his wife's attitude toward him, and while he suspected that her coolness and indifference toward him were in direct ratio to her ardor and warmth for Martin, his suspicions were not confirmed until the Spring of 1948 when the gradually increasing breach between the couple was broken wide open by a flagrant act of misconduct on her part.

On account of the inordinate amount of time she would spend on "shopping" tours with Martin, consuming half a day when half an hour would suffice, and other evidence that she much preferred his society to that of her husband—even to the extent of remaining downstairs drinking with him under the pretext that she was having a drink with her father, when her husband who had just that day returned home from the hospital after an operation repeatedly called for her and told her that he needed her on the second floor—he had discharged him and engaged another chauffeur. But his wife, instead of using the new chauffeur on a trip to Wayne, Pa., to visit her son by a former marriage who was attending Valley Forge Military Academy, engaged Martin to make the trip, paying him out of her

624

house money. They took with them Jean Kehrli, a young girl friend of her son. Mrs. Phipps had engaged rooms for herself, Miss Kehrli, and Martin in the home of a Mrs. Leary, and after Miss Kehrli had attended a dance with the son she returned to the rooms with Mrs. Phipps and the chauffeur. After Mrs. Phipps and the young girl had undressed and were ready for bed, Martin came into the bedroom. They had a drink together and Miss Kehrli said Martin was still in the bedroom talking with Mrs. Phipps when she fell asleep.

They left Wayne at about 10 o'clock the following (Sunday) night for Scranton. Bradford Sweet, Mrs. Phipps' son, was with them. According to Martin and Mrs. Phipps, they lost their way (although the former was an experienced chauffeur and had made the trip between Wayne and Scranton several times) and landed in Stroudsburg, Pa., between 1:30 and 2 a.m. Sweet and Martin, according to Martin (the boy did not testify), engaged two rooms with connecting bath—Martin registering as Mr. and Mrs. George Sweet, 517 Main Street, Scranton, Pa. The night manager at the Penn-Stroud Hotel identified the registration card and said that since there were four persons in the party he added the words "and family." Martin said he used the name of Mrs. Phipps' first husband at the suggestion of her son. Jean Kehrli testified that at Mrs. Phipps' direction she and Brad Sweet occupied the room with the twin beds, while Mrs. Phipps and Martin slept in the room with the double bed. Her testimony was contradicted by respondent and Martin, both of whom testified that the woman and the girl occupied one room, while the man and the boy occupied the other. The Kehrli girl further testified that, within two or three weeks of the trial of this proceeding, Mrs. Phipps had asked her if she would please tell anyone who asked her "that she occupied that room with me that night."

We feel as did Judge EAGEN, who said: "The testimony of the witness, Jean Kehrli, I believe to be truthful. Her account of the details of the trip to Wayne, Pennsylvania, and the stopover in a hotel in Stroudsburg upon their return leads to but one conclusion, and that is that the respondent and Martin were carrying on a sordid, immoral relationship.

"The facts brought to light by the testimony of this witness . . . makes everything else in respect to their frequent associations add up and paints a clear picture of what was happening. Between the 28th day of August and the end of September last year, they were together thirty-four times, in many instances in respondent's apartment until a very late hour. One would need be quite naive to believe as respondent would have us to do that this was simply an innocent, sympathetic friendship."

Counsel for respondent moved to strike the testimony of Jean Kehrli and argue that you cannot establish indignities by proving adultery. If staying together in the same room at the hotel at Stroudsburg had been the only evidence of misconduct on the part of respondent, we would readily agree; but it was not. In addition thereto was the testimony of Martin's wife, who at the time was engaged as a cook in the Phipps' home. She testified that on one occasion when Mrs. Phipps had too much to drink before dinner she asked Martin to take her out where she could get some air. He put her on the seat of the automobile with the door open, so that her feet were resting on the running board, and placed his arm around her. As to her drinking habits she testified on direct examination that she would take "a drink now and then" but she "never had any more than five." Mrs. Martin testified that she did most of her drinking in the kitchen when they had guests "so she could have more," and while Mrs. Martin admitted that she herself drank more than she should, she testified that Mrs.

Phipps "was never satisfied until she had enough" and that for her "enough" was "half a dozen." Finally both Martin and his wife left the employ of the Phippses and later, at the written request of Mrs. Phipps, Martin went back; but Mrs. Martin went to work as a waitress in the Moses Taylor Hospital, where she was employed at the time of the hearing.

Anna Doss, who succeeded Mrs. Martin as cook, testified that after Martin would drive Mr. Phipps to his office he would spend most of the time in the house with Mrs. Phipps; and that on one occasion when she was ironing and something went wrong with the iron she called to Martin and after waiting as she thought "until the iron got hot, . . . I walked there, and he was with Mrs. Phipps in the front room, and had his arms around her and kissing each other."

After separating from libellant, respondent went to live with Nancy Coleman, Martin's sister, and her husband, Andrew, in Dalton, Pa., and remained there from June 26, 1948, to October 1, 1948. Martin lived at the same place for the same length of time. Respondent then obtained an apartment on Adams Avenue for herself and son, and after she moved there she was frequently visited by Martin, who would arrive any time between 7 and 9 o'clock in the evening and remain any time from 11 p.m. until 2 o'clock in the morning.

Illustrative of the type of person he is, a letter written by him to the respondent's son is revealing. In part, it is as follows: "October 23, 1947. Hia Brad. How are you doing these days hope every thing is going fine for you down there as for me not too bad. Sorry I did not see you the last time your mother came down guess you knew I quit. I was sorry after, I hated to leave your mother with that S. B. but you know me I hate to be made a liar out of any way Brad I will see you again one of these days I hope. How is Jean. Tell her I asked

after her. She really is a swell girl, take good care of her and don't forget that date you often spoke of Jean, you, your mother and I. Guess we could have a pretty nice time. Only leave D. H. home. I might take a poke at him just for fun. I saw your mother a couple of days before she went to Fla. She is awfull nervouse, to bad she cannot get out of there, she would be a lot better off. I sure feel sorry for her. I told her I would drop you a few lines to let you know I did not forget you. Don't ever mention me in any of your letters to her, Brad. You know the old man, he don't mind whose mail he reads, so be very careful for your Mothers sake. . . . Well Brad guess this is all for now hope you can read this scribble and don't forget not a word in any of your letters to your Ma and destroy my letters to you don't take any home with you and if you ever want to get in touch with me write in care of A. B. Coleman, Box 246, Dalton, Pa. Good Luck and good health. Yours truly Fred Martin."

The letter which is dated October 23, 1947, was sent to the boy shortly after he entered the Military Academy, and Martin didn't let him "forget that date you often spoke of Jean, you, your mother and I." He apparently, with the connivance of respondent, held him to it that night in Stroudsburg when he used the name of the boy's father in registering for rooms for "your mother and I" and the boy and the girl.

Illustrative of the type of woman she is, is the testimony of her mother and father that when, in trying to persuade her to leave the Coleman place, her mother told her that she felt her place was with her husband, she said to her mother, in the presence of her father—both parents testified to this—"I hate your guts."

The learned judge of the court below found, and properly so, that respondent was carrying on an affair with Martin somewhat similar to the one being carried

on by the respondent in *Blansett v. Blansett*, 162 Pa. Superior Ct. 45, 56 A. 2d 341, which we condemned in the following language, at page 48: "That his wife's affair with Brisbain in itself constituted an indignity is abundantly clear, and it cannot be condoned on the ground that it was merely an 'indiscretion' on her part."

In the instant case libellant was extremely indulgent toward his wife, and although he had good reason for suspecting that she was having an affair with the chauffeur-butler, he took no action until she openly and notoriously sought his companionship and society in preference to that of libellant.

Upon a review of the whole record, it is our independent judgment that respondent was guilty of a continuous course of conduct such as to constitute indignities.

Decree affirmed.